# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-01524-SCT

*ANTONIO MURRAY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/04/2001 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DONNA SUE SMITH |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/24/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    Having been convicted of five counts of aggravated assault and sentenced to five concurrent fifteen years sentences in the custody of the Mississippi Department of Corrections, Antonio Murray (Murray) appeals from the final judgment of the Circuit Court of Lowndes County, claiming that the circuit court erred in denying his motion to dismiss the charge of murder against him, in refusing jury instructions, and in abusing its discretion as to the admissibility of evidence. Finding no reversible error, we affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.    On April 23, 1999, a party was held at the home of Monique Ledbetter, located on the corner of 11th Avenue South and 7th Street South in Columbus. As it began to get dark, the party spilled over from the house to the vacant lot directly across the street. At least 100 people attended the party, including members of two rival gangs.

¶3.    Around 10:00 p.m., people from the "Northside" of Columbus began to arrive at the party, including Aaron Dumas, Keisha Thomas, Corrie Morris, Dathan McCoy, and Jimmy Weatherspoon. Earlier in the day, Murray had gotten into a fight with Dumas's cousin. When Dumas heard loud words coming from Mareyo Hines, Murray's cousin, he attempted to get his friends in his car and leave the scene of the party. However, as he was trying to leave, a bottle was thrown at his rear window. He turned around and saw Murray "pull up a gun and start shooting." Dumas testified that he saw Murray pull the gun from under his shirt. When Murray fired the gun, the car's rear window shattered; however, the occupants were able to flee the scene unharmed. Tragically, Ledbetter was killed outside her home by one of the errant bullets.

¶4.    After arriving at a safe location, Dumas noticed a bullet hole in his back passenger window. When questioned by police, Dumas stated he heard approximately four or five shots fired. He indicated that Murray was behind his car and at an angle when Murray fired the shots. Dumas testified that he did not see anyone else at the party with a handgun.

¶5.    Shift Lieutenant Carl Kemp of the Columbus Police Department examined the car driven by Dumas. Lt. Kemp found two projectiles in Dumas's vehicle. The two fragments were collected and sent for testing. At the hospital, Shift Lieutenant Keith Worshaim gave

2

Lt. Kemp Ledbetter's clothing and a specimen bottle containing one spent projectile removed from the deceased. After searching the crime scene, the police were unable to locate spent cartridges or the murder weapon.

¶6. After interviewing witnesses who were present when the shooting occurred, it was determined that Murray was a chief suspect. Testimony differed widely as to how many shots were fired and their point of origin. At least six witnesses testified that they saw Murray with a gun, and several saw him fire it at Dumas's vehicle. Several witnesses testified that Hines was trying to start a fight with Dumas as he and the others were leaving and that Murray was standing nearby with a gun. Many witnesses testified that shots were coming from different places.

¶7. For one year and three months, all evidence relating to the murder and aggravated assaults laid undiscovered in Lt. Kemp's file cabinet. At some point, Lt. Kemp sent two projectiles to the FBI laboratory for ballistics testing identifying one as being from Ledbetter's body and the other as being recovered from Dumas's vehicle. The FBI testing revealed that both of the projectiles could have been fired by the same gun. A more definite conclusion could not be reached. The report also stated that the projectiles most likely came from either a Hi-Point nine millimeter Luger pistol, a Hi-Point .380 caliber pistol, or a Hi-Point nine millimeter Luger carbine. Eyewitness testimony revealed, and Murray admitted, that he had a nine-millimeter pistol that night.

¶8. At the trial, Shemika Murray, Murray's sister, testified that she gave Murray the nine-millimeter handgun. She testified that she hid the gun in a barbeque grill, but later that night

Murray "tossed" the gun into some bushes. Lt. Kemp testified that Shemika told him that Murray threw the gun toward the Tombigbee River.

¶9. Lieutenant Selvain McQueen later took over Murray's case. He discovered the evidence in Lt. Kemp's file cabinet, created an evidence card, and placed it in an evidence locker. In February 2001, defense counsel went to the police department and asked to see the evidence. Lt. McQueen and others produced a brown paper bag which contained Ledbetter's clothing, a gun shot residue kit and a sealed clear specimen container containing a projectile which was marked by Lt. Worshaim as the projectile he was given at the hospital the night Ledbetter was killed.

¶10. Shortly thereafter, District Attorney Forrest Allgood met with the officers involved in the case and viewed the same evidence. There was no notation on the evidence card that the third projectile was removed from the evidence locker for viewing during this meeting, but there was testimony that it was removed from the container and viewed. This was the last time the third projectile was seen.

¶11. In March 2001, the trial court ordered that the third projectile, which was viewed by Allgood and previously by defense counsel, be sent to the FBI laboratory. In late April and early May, the district attorney and defense counsel were notified that the third projectile was missing and was never sent to the FBI lab.

¶12. After it was discovered that the third projectile was missing, the first projectile, which Lt. Kemp had labeled as coming from Ledbetter's body and sent to the FBI laboratory, was sent to a genetics laboratory. It was determined that it did not have blood on it. The second

4

projectile, which had also been tested at the FBI lab and which Lt. Kemp labeled as coming from Dumas's vehicle, was not sent in for this same analysis.

¶13. A stipulation was entered into the record that the bullet received from the hospital had been lost from police custody prior to trial. That bullet had never been tested by either the prosecution or the defense.

¶14. Murray was convicted of five counts of aggravated assault upon Dumas, Jimmy Weatherspoon, Keisha Thomas, Corrie Morris, and Dathan McCoy and was sentenced to serve five concurrent sentences of fifteen years in the custody of the Mississippi Department of Corrections. Then, the State filed a motion to dismiss the murder count without prejudice against Murray, and this motion was granted. Murray filed a motion for JNOV or, in the alternative, a new trial which was denied by the trial court. Murray timely appealed to this Court, citing the following issues for consideration:

    **I.**     **WHETHER THE CIRCUIT COURT ERRED IN DENYING MURRAY'S DUE PROCESS MOTION TO DISMISS THE MURDER CHARGE AGAINST HIM.**

    **II.**     **WHETHER THE CIRCUIT ERRED BY REFUSING JURY INSTRUCTIONS D-31 AND D-32.**

    **III.**     **WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE PROSECUTION TO ELICIT TESTIMONY ABOUT THE AUTOPSY OF THE MURDER VICTIM AND THE GUN SHOT RESIDUE KIT TAKEN FROM THE MURDER VICTIM'S BODY.**

    **IV.**     **WHETHER THE TRIAL COURT ERRED BY SUSTAINING THE STATE'S OBJECTION TO TESTIMONY REGARDING AARON DUMAS'S PRIOR CONVICTION.**

## DISCUSSION

5

**I.   WHETHER THE CIRCUIT COURT ERRED IN DENYING MURRAY'S DUE PROCESS MOTION TO DISMISS THE MURDER CHARGE AGAINST HIM.**

¶15.   Murray was indicted on five counts of aggravated assault and one count of murder. Before the trial commenced on the aggravated assault charges, Murray filed a pretrial motion to dismiss the murder charge based on a denial of due process and intentional loss of evidence. The trial court denied this motion; however, the trial commenced only as to the five counts of aggravated assault.

¶16.   In a recent opinion, this Court held:

> The standard that developed after *[California v.] Trombetta*, [467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)] is that the evidence in question must meet the two-part test stated above, that (1) evidence must possess an exculpatory value that was apparent before the evidence was destroyed, and (2) be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. In addition, "the prosecution's destruction of evidence must not have been in bad faith." *Tolbert,* 511 So.2d 1368, 1372 (Miss. 1987); *see also Taylor,* 672 So.2d 1246, 1271 (Miss. 1996)(citing *Tolbert*).
>
> The question of whether *Trombetta* actually mandated a finding of bad faith on the part of the State in such cases was no longer open to interpretation after the U.S. Supreme Court's decision in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). *Youngblood* dealt with a failure to refrigerate clothing worn by a victim of a sexual assault and to test the clothing for semen samples. In *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333, the U.S. Supreme Court stated: "We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." The *Youngblood* rule was applied by this Court in *Holland v. State,* 587 So.2d 848, 869 (Miss. 1991).

*State v. McGrone*, 798 So. 2d 519, 522 (Miss. 2001). Therefore, this Court has adopted a three-part test which is to be applied when a due process violation has been claimed by the defendant.

6

While bad faith may not be a prong of the two-part test for materiality under *Trombetta,* it is a requirement for a due process violation in a preservation of evidence case under *Youngblood, Tolbert, Taylor,* and the Court of Appeals decision in *Trollinger v. State,* 748 So.2d 167 (Miss.Ct.App.1999). We therefore clarify that the following is required in order to find a due process violation by the State in a preservation of evidence case: (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*McGrone*, 798 So. 2d at 523.

¶17.    The first prong of the test specifically states the exculpatory nature of the evidence must have been apparent before the evidence was destroyed. Here, there is no evidence that law enforcement was aware of the exculpatory value of the projectile. It had not been tested; therefore, there is no way anyone could have known in advance how the test results would have turned out.

¶18.    Regarding the second prong, there can be no question that Murray wholly failed to meet this requirement. Murray must show that comparable evidence could not be obtained by other reasonable means. Clearly, Murray could have produced the key piece of evidence which would have conclusively and forever proven his innocence–the gun. This, of course, presumes that he is telling the truth. According to Murray's sister, he tossed the gun near a bluff on the Tombigbee River. She later testified that she retrieved the gun and hid it in a barbecue grill, and Murray later threw it in some bushes. Without question, it was totally in Murray's hands to produce the weapon. He chose not to do so even when this was the best evidence to clear himself.

7

¶19.    Bad faith, the third and final prong, is defined as "not simply bad judgment or negligence, but rather . . . conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." Black's Law Dictionary 139 (6th ed. 1990). *Tolbert* also dictates that an inference that the evidence was favorable to the defense exists only "where the spoilation or destruction was intentional and indicates fraud and a desire to suppress the truth." 511 So. 2d at 1372 (quoting *Washington v. State*, 478 So. 2d 1028, 1032-33 (Miss. 1985)). Although the actions of the officers could certainly be characterized as negligent, there is no evidence of fraud, willful or deliberate destruction of evidence or a desire to suppress the truth by the State, and there is certainly no evidence of gross negligence.  The only intentional destruction of evidence that occurred in this case was by Murray.  There is no merit to Murray's claims.  Therefore, we find that the trial court did not err in its denial of the pre-trial motion to dismiss the murder charge.

**II.    WHETHER THE CIRCUIT ERRED BY REFUSING JURY INSTRUCTIONS D-31 AND D-32.**

¶20.    Murray argues that the trial judge erred in refusing to instruct the jury on the spoilation of evidence. He argues that such instruction was necessary since the lost evidence was exculpatory in nature and hindered his ability to put on a comprehensive defense. Murray contends that the circumstances in this case warrant such instruction due to the extreme inferences of fraud and suppression of evidence which establish an intentional spoilation of evidence.

¶21.    Murray's proposed Jury Instruction D-31 read as follows:

8

The Court instructs you the Jury that, if you believe that a sealed container with a blue lid was placed into the Columbus Police Department evidence room by Lt. Carl Kemp on July 24, 2000, and the sealed clear container with the blue lid remained in the custody of the Columbus Police Department until sometime after the District Attorney and the Columbus Police Department detectives unsealed that container and discovered therein a spent projectile and, further, you also find that the spent projectile, but not the clear container with a blue lid, disappeared sometime afer this Court ordered that spent projectile sent, by Columbus Police Department, to the FBI Laboratory for testing and analysis, then you must decide if the loss, or spoliation, of that spent projectile indicates fraud and a desire to suppress the truth or if the loss was intentional or negligent.

If you find from the evidence, beyond a reasonable doubt, that the loss of the spent projectile which had been in the sealed clear container with the blue lid in the Columbus Police Department evidence room was intentional or indicates fraud with a desire to suppress truth, then you may infer that the testing and analysis of the lost, spent projectile would have been unfavorable detrimental to the prosecution of the State's case against Antonio Murray and you the Jury may give the loss of that evidence such weight, worth, credibility and importance as you determine it entitled.

Murray's proposed Jury Instruction D-32 read as follows:

The Court instructs the jury that if you believe Officer Keith Worshaim retrieved a clear plastic container with a blue top and containing a spent projectile inside that container and that Officer Worshaim turned that container and its contents over to Cpl. Carl Kemp who placed the container into the evidence locker at the Columbus Police Department and that, after this Court ordered the forensic examination of the spent projectile found in the clear plastic container with a blue lid, the Columbus Police Department could not, and has yet, located that spent projectile then the failure of the State of Mississippi to produce that spent projectile at this trial creates an inference that the production of the spent projectile would have been detrimental to the State's prosecution of this case.

¶22. The well-established standard of review for challenges to jury instructions is as follows:

Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which

9

incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Austin v. State*, 784 So.2d 186, 192 (Miss. 2001)(quoting *Humphrey v. State*, 759 So.2d 368, 380 (Miss. 2000)).

*Smith v. State*, 802 So.2d 82, 88 (Miss. 2001).

¶23.    As we have previously stated, there is no evidence in the record the police department intentionally spoiled any evidence pertaining to this trial. Because there was no evidence supporting these instructions, the trial court did not abuse its discretion in refusing to grant the instructions requested by Murray.

> **III.    WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE PROSECUTION TO ELICIT TESTIMONY ABOUT THE AUTOPSY OF THE MURDER VICTIM AND THE GUN SHOT RESIDUE KIT TAKEN FROM THE MURDER VICTIM'S BODY.**

¶24.    Pursuant to this Court's standard of review, the admissibility of evidence rests within the trial court's discretion. *Hall v. State*, 611 So.2d 915, 917 (Miss. 1992); *Johnston v. State*, 567 So.2d 237, 238 (Miss. 1990). However, this discretion must be exercised within the confines of the Mississippi Rules of Evidence. *Id.* at 238. This Court will only reverse the ruling of a trial court where such discretion has been abused and a substantial right of a party has been affected. *Johnson v. State*, 666 So.2d 499, 503 (Miss. 1995); *Green v. State*, 614 So.2d 926, 935 (Miss. 1992).

¶25.    Murray argues that the trial court erred in allowing, over objection, the prosecutor to elicit testimony concerning the Ledbetter autopsy and homicide investigation. He claims that contrary to the prosecutor's argument, counsel did not "open the door" to this line of questioning. He asserts that the admission of this testimony was significantly prejudicial and caused the jury to consider that a homicide had been committed the night of the aggravated

assaults and could easily have swayed the jury to believe Murray was responsible for this homicide.

¶26.    The State contends that it was only attempting to clarify the confusion surrounding testimony as to the collection and storage of evidence. The State further argues that the trial court denied Murray's motion in limine to prevent the prosecution from admitting evidence or testimony of the murder investigation because the murder and the aggravated assaults were so interconnected that mention of the homicide was necessary for the presentation of a coherent case.

¶27.    Murray relies on *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), in arguing that the door was not opened. However, in *Young*, the U.S. Supreme Court was reviewing comments made by the prosecutor in closing arguments in an attempt to counter defense counsel's repeated attacks on the prosecutor's integrity. The Supreme Court stated that a criminal conviction was not to be overturned on the basis of the prosecutor's comments standing alone, but the statements and conduct of all parties must be viewed in context. *Id.* at 11.

¶28.    In the case subjudice, defense counsel elicited testimony from Lt. Kemp concerning the autopsy and the gun shot residue kit taken from Ledbetter. The prosecutor's inquiry on re-direct examination only developed the defense inquiry. Additionally, the trial court found that the probative value of the evidence outweighed any prejudice and gave a jury instruction directing the jury to disregard the murder evidence in making its determination on the charges at hand.

¶29. The general rule is that a defendant cannot complain of the evidence which he himself brings out. ***Simpson v. State***, 366 So.2d 1085, 1086 (Miss. 1979) (citing ***Stone v. State***, 210 Miss. 218, 49 So.2d 263 (1950)).

> [W]here the defense attorney inquires into a subject on cross-examination of the state's witness, the prosecutor on rebuttal is certainly entitled to elaborate on the matter. For example, in ***Jefferson v. State***, 386 So.2d 200 (Miss. 1980), the defendant's attorney on cross-examination asked the prosecutrix in a rape case regarding a prior rape the defendant had allegedly committed. On redirect, the prosecuting attorney developed the details of the prior incident. On appeal, we held that evidence of the prior rape, though otherwise inadmissible, could properly be presented by the prosecution where the defendant has opened the door. *See **Simpson v. State***, 366 So.2d 1085, 1086 (Miss. 1979); ***Johnson v. State***, 260 So.2d 436, 438 (Miss. 1972). When allowing this sort of testimony, however, the trial judge should be careful to assure that the prosecution does not go beyond the scope of the "invitation" extended by defense counsel. Based upon our careful review of the transcript in this regard, we find that the invitation was not exceeded.

***Winters v. State***, 449 So.2d 766, 770-71 (Miss. 1984).

¶30. Because the prosecution did not exceed its invitation extended by defense counsel, we find no abuse of discretion in the allowance of the testimony concerning the investigation of the homicide.

### IV. WHETHER THE TRIAL COURT ERRED BY SUSTAINING THE STATE'S OBJECTION TO TESTIMONY REGARDING AARON DUMAS'S PRIOR CONVICTION.

¶31. Murray argues that the trial court erred in refusing to allow him to develop testimony concerning Dumas's prior conviction and pending charge of cocaine possession. He argues that the trial court's determination that such questioning would be improper impeachment violates his Fourteenth Amendment due process rights to fully cross-examine witnesses

12

against him. He further argues that the Mississippi Rules of Evidence allow wide-open cross-examination and impeachment of witnesses through evidence of prior conviction.

¶32. This Court has repeatedly held that "when testimony is excluded at trial, a record must be made of the proffered testimony in order to preserve the point for appeal." *Evans v. State*, 725 So.2d 613, 669-70 (Miss. 1997) (quoting *Gates v. State*, 484 So.2d 1002, 1008 (Miss. 1986)). *See also* Miss. R. Evid. 103(a)(2); *Woodham v. State*, 800 So.2d 1148, 1153 (Miss. 2001); *Russell v. State*, 607 So.2d 1107, 1114 (Miss. 1992). In *Settles v. State*, 584 So.2d 1260, 1265 (Miss. 1991), this Court stated "if a proffer is required in the face of an erroneous ruling, surely no less is required to preserve the issue where no ruling is made." Because Murray made no proffer for the record to preserve the issue for appeal, we need not address this issue.

## CONCLUSION

¶33. The trial court properly denied Murray's motion to dismiss the murder charge, because Murray failed to prove intentional spoliation of evidence by the Columbus Police Department. The trial court was also correct in refusing to allow a spoliation of evidence instruction because the proposed instructions were not supported by the evidence. The trial court did not abuse its discretion in allowing the prosecutor to further inquire as to testimony concerning the autopsy and gathering of the gun shot residue kit from Ledbetter's body after the defense counsel opened the door on cross-examination, or by sustaining an objection to additional testimony relating to Dumas's prior convictions. Finding no reversible error, the judgment of the Circuit Court of Lowndes County is affirmed.

¶34. **COUNTS II-VI: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF FIFTEEN (15) YEARS EACH IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES SHALL RUN CONCURRENTLY WITH SENTENCES IMPOSED IN ANY OTHER COUNT.**

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB AND DIAZ, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. McRAE, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. EASLEY, J., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶35. I agree with the affirmance of the trial court's judgment and with the majority's opinion, since it was this writer's original majority with the exception of a couple of sentences with regard to the due process claims of the defendant concerning his motion to dismiss. Ultimately, the murder charge was never brought to trial, since the State's motion to dismiss that charge was granted. Therefore, even if his due process rights had been violated, Murray was not prejudiced or injured since the charge was ultimately dismissed. I write separately only to point out that the issue regarding the motion to dismiss the charge of murder is moot; therefore a factual and meritorious determination of the issue is unnecessary.

¶36. Murray filed a pre-trial motion to dismiss the murder charge pending against him. Instead of dismissal, the circuit court chose to carry forward with the five aggravated assault charges and reserve ruling as to the murder charge. After Murray's conviction on the five counts of aggravated assault, the State filed a motion to dismiss the murder charge. The circuit court found the State's motion to be well taken and granted the dismissal. Murray now claims that his due process rights were violated by the court's refusal to grant his motion

14

to dismiss the murder charge. One can clearly see from the facts just laid out, the issue is moot. "The doctrine of mootness applies to cases where an actual controversy no longer exists." *Pickle v. State*, 791 So.2d 204, 207 (Miss. 2001). There no longer is a controversy as the murder charge has been dismissed. Once the murder charge was dismissed by the circuit court, Murray's arguments regarding due process in relation to said charge were eliminated and it thus became a moot issue. For this reason, it is not necessary for the majority to reach the merits of Murray's claim regarding a due process violation. The issue should have simply been summarized as moot without inquiry.

¶37. For this reason, I specially concur.